FILED

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

98 SEP 28  AM 9: 49

U.S. DISTRICT COURT
N.D. OF ALABAMA

TIA GRAHAM,                              ]
                                         ]
      Plaintiff,                        ]
                                         ]
      vs.                               ]
                                         ]   CV 97-N-2039-S
STATE FARM MUTUAL                        ]
AUTOMOBILE INSURANCE CO., et             ]
al.,                                     ]
                                         ]
      Defendants.                       ]

ENTERED

SEP 2 8 1998

### Memorandum of Opinion

This action was brought pursuant to the Family and Medical Leave Act (FMLA), 28 U.S.C. § 2601 *et seq.,* and various Alabama state laws. With regard to the FMLA, the plaintiff alleges that State Farm Mutual Automobile Insurance Co. (hereinafter "State Farm") and defendant Jean Estes, a senior occupational health nurse at State Farm, violated her rights under the statute by discriminating against her, harassing her, denying her FMLA protections, retaliating against her for taking leave protected under the FMLA, and constructively discharging her, among other things. Graham also asserts claims on theories of negligence, negligent hiring and training, fraud, and breach of contract, and seeks declaratory and injunctive relief, reinstatement, back pay, and compensatory and punitive damages.

The matter is presently before the court on a motion for summary judgment filed by State Farm on July 30, 1998. The motion has been fully briefed and is ripe for decision. Upon due consideration, defendant's motion for summary judgment will be granted.



## I.    Statement of Facts.[1]

Plaintiff Tia Graham was hired by State Farm on July 6, 1993, to work as a communications operator at State Farm's Alabama-Mississippi Regional office in Birmingham, Alabama. *Depo. of T. Graham* at 35. As a communications operator, her job duties included answering the telephone and transferring calls, locking and unlocking certain doors, and keying in car mileage on the computer. *Id.* at 35-38, 43-45. At some point during Graham's employment, she was also given the responsibility of processing certain communications invoices. *Id.* at 39, 40, 47. Her assigned working hours were 8:00 a.m. to 4:15 p.m. *Id.* at 46. While employed by State Farm, Graham was an employee-at-will. *Aff. of Brian Lancaster* at ¶ 8.

Angela Graham was hired at State Farm as a management trainee and received a year of management training. *Depo. of A. Graham* at 13-14, 21. In November of 1994, she became plaintiff's immediate supervisor. *Id.* at 25; *Depo. of T. Graham* at 62. Angela Graham reported to Assistant Manager Jan Youngman and Administrative Services Manager Marvin Reeves. *Depo. of A. Graham* at 14.

Angela Graham received Family and Medical Leave Act (FMLA) training at the Alabama Regional office; the FMLA training session was for State Farm management and lasted less than one day. *Depo. of A. Graham* at 46-49. At the training, Angela Graham was "taught our responsibility . . . and about the FMLA," the main thrust of which "was I was not

---

[1] In developing the statement of facts in this opinion, the court considered those facts claimed to be undisputed by the parties, the parties' respective responses to those claims, and the court's own examination of the evidentiary record. These are the "facts" for summary judgment purposes only. They may not be the actual facts. *Cox v. Administrator U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994), *cert. denied*, *USX Corp. v. Cox*, 114 S. Ct. 900 (1995).

2

a medical doctor, and that it wasn't my responsibility to discuss illnesses with employees, that if an employee wanted FMLA protection, it was their responsibility to seek that protection and to work with medical on getting it." *Id.* at 46-48, 123-24. Angela Graham received no other training or education on the FMLA or State Farm's FMLA policies. *Id.* at 123-24.

State Farm's FMLA policy is that an employee must provide a request under the FMLA within two days of returning to work in order for State Farm to designate FMLA protection; employees do not receive FMLA protection from State Farm if they do not make the request within two days. *Depo. of Jean Estes* at 157-58. Pursuant to State Farm's policies, an employee must complete a written request form in order to receive FMLA protection for an absence from State Farm. *Id.* at 158-59. State Farm does not consider the completion of a Medical Certification Form by a doctor a request for FMLA protection. *Id.* at 163-64. If State Farm receives a Medical Certification Form but no request form, State Farm does not consider the absence protected by the FMLA. *Id.* at 163-65.

At State Farm, only non-FMLA protected absences resulted in absentee memos. *Depo. of A. Graham* at 55. Angela Graham does not know who at State Farm determines whether an employee's absence is FMLA protected; she just looks at records from her department secretary that shows a list of absences that are nonprotected. *Id.* at 57. Pursuant to State Farm's FMLA policy, the occupational health nurse at State Farm's Alabama-Mississippi Regional office is charged with the responsibility of making determinations regarding the FMLA. *Depo. of Thomas Goya* at 49, 58, 59, 71. The senior occupational health nurse at State Farm's Alabama-Mississippi Regional office is Jean

3

Estes. *Depo. of Jean Estes* at 53. Estes has been employed by State Farm since 1961. *Id.* at 35-36. Estes received at least a day and a half of training regarding the FMLA at State Farm's headquarters in Illinois. *Id.* at 69-70. Estes made the FMLA decisions; if she had any question regarding an FMLA designation, she could go to her manual, to management or to corporate. *Id.* at 162-63. Estes would not make an FMLA determination on information obtained verbally from an employee: "To me, if anything is not in writing, it didn't happen." *Id.* at 77-78.

State Farm established an FMLA committee consisting of employees from several different departments of State Farm to look at State Farm policies and assist in drafting new policies to comply with the FMLA. *Depo. of Thomas Goya* at 34-35. Thomas Goya, Kathy Leff, Sverre Olsen (State Farm in-house corporate counsel), and others were members of the FMLA committee. *Id.* at 35. Drafts of the FMLA policy were submitted to corporate counsel, *Id.* at 38, and an FMLA policy was adopted by State Farm. *Id.* at 37.

The State Farm FMLA policy "did not permit absences covered under FMLA to result in negative employment action against an employee when absences were considered covered or protected by the FMLA." *Id.* at 49. Under State Farm's policy, if an absence qualified under the FMLA, it would be an FMLA protected absence. *Id.* at 50.

State Farm nurses were trained on how to administer the FMLA policy. *Id.* at 52. After the initial training sessions, State Farm corporate did not conduct subsequent FMLA training sessions. *Id.* at 52-53.

The primary responsibility for determining whether an employee's absence was one that was covered by the FMLA was on the Medical Department, and those determinations

4

were generally made by the nurse, pursuant to State Farm's policy. *Id.* at 58-59. Supervisors had the responsibility to assist the Medical Department (the nurse) in determining whether the employee met a one-year employment requirement and the 1250 hour requirement, as well as whether the employee had exhausted his or her allotment of FMLA. *Id.* at 56-57.

During plaintiff's employment, she received an employee benefits binder which includes a summary of State Farm's policy regarding the FMLA. *Depo. of T. Graham* at 185, Ex. 11. However, plaintiff does not recall reading the FMLA policy or it being a part of her binder. *Id.* at 185-86. Plaintiff attended an FMLA training course given to State Farm employees on August 1, 1995. *Id.* at 129-131. Plaintiff received written materials concerning State Farm's FMLA policy at the training session. *Id.* at 183.

On Tuesday, August 29, 1995, plaintiff and her daughter, Nicole Delgado, (who was then age 13) were in a car accident. *Id.* at 13, 77. Plaintiff and her daughter were stopped at a red light in their car when a truck hit them from behind. *Id.* at 77, 110. Immediately after the accident, plaintiff was examined at Carraway Methodist Hospital, where she complained of soreness in the left shoulder and neck. *Id.* at 109; *Depo. of Marc Husid* at 12. X-rays of plaintiff's spine were taken at the hospital and were normal. *Depo. of Marc Husid* at 12, 13. Plaintiff was released from the hospital after two to three hours. *Depo. of T. Graham* at 109.

That evening, plaintiff called Jan Youngman to notify him that she had been in a car accident. *Id.* at 113, 114. Plaintiff saw her family practitioner, Dr. John Holloway, on August 31, 1995. *Id.* at 108, 109. On August 31, 1995, Dr. Holloway indicated that Graham could return to work on Tuesday, September 5, 1995. Monday, September 4, 1995 was Labor Day

5

and plaintiff was not scheduled to work that day. Youngman "told [plaintiff] not to worry about it, just stay off until Monday and just relax and just stay out until Monday, there would be no problem." *Id.* at 114, 115. Prior to the auto accident, Plaintiff's State Farm records do not show attendance or other employment problems on the part of Plaintiff. *Depo. of Jean Estes*, Ex. 22. Angela Graham, as Plaintiff's supervisor, had no trouble with Plaintiff up to that point. *Depo. of A. Graham* at 33.

When plaintiff returned to work on September 5, 1995, she checked in with State Farm's senior occupational health nurse, defendant Jean Estes. *Depo. of T. Graham* at 116. Plaintiff presented Estes with a return to work form dated August 31, 1995 from Dr. Holloway which stated:

> This is to certify that Tia Graham has been under my care for the following: car accident and is able to return to work on September 5, 1995.

*Depo. of T. Graham,* Ex. 4. Plaintiff claims that as she checked in with Estes on September 5, 1995, she told Estes that she was "probably going to have to go for physical rehab for this condition." *Id.* at 117. Plaintiff also claims she asked Estes if there was "an Act or something that would cover [her] in case [she] had to go on leave to go to therapy." *Id.* Estes represented to Plaintiff on that day that the time in which she could claim FMLA protection for her absences on August 30 and 31 and September 1, 1995, and generally for the injuries Plaintiff suffered as a result of her automobile accident, were waived because Plaintiff had not claimed FMLA protection for the injuries she sustained in the accident within two days. *Id.* at 212-15. Estes told Plaintiff that she could never request FMLA protection relating to her injuries from the auto accident. *Id.* Estes told plaintiff that

6

plaintiff's supervisor, Angela Graham, "is very nice, that she would work with me any way if I had to take time off in the day to go to therapy, she just said explain it to Angela . . . and she would give [her] no problem with it." *Id.* at 117, 118, 129.

After the initial three days of absence after the accident, plaintiff was present at work until September 14, 1995. *Id., Ex.* 6. Plaintiff was also absent on September 20, 1995, and such absence was classified as a paid vacation day. *Id.*, Ex.6. Plaintiff was absent for a few hours on September 25 and 27—time which was classified as "Paid Doctor." *Id.* Plaintiff worked every scheduled day in October, only missing one hour and forty-five minutes on October 23, 1995—time which was classified as "Paid Doctor." *Id.* Plaintiff worked every scheduled day in November 1995. *Id.* Plaintiff missed only one full day in December 1995—December 4, 1995—which was classified as paid sickness family. *Id.* Plaintiff took a half day of paid vacation on December 22, 1995. *Id.* Plaintiff was absent on January 3, 1996, and such absence was classified as paid sick leave. *Id.* Plaintiff was absent two hours and fifteen minutes on January 10, 1996, and such absence was classified as personal time. *Id.* Plaintiff was absent two and a half hours on January 18, 1996, and such absence was classified as paid doctor. *Id.* Plaintiff was absent on January 24, 1996, and such absence was classified as personal time. *Id.* Plaintiff was absent five and a half hours on February 14, 1996, and such absence was classified as personal time. *Id.* Plaintiff was absent on March 18, 1996, and such absence was classified as paid sick leave. *Id.* Plaintiff was absent April 2 and 3, 1996, and such absences were classified as leave of absence. *Id.* Plaintiff was absent April 24, 1996, and such absence was classified as paid sick leave. *Id.* Plaintiff was

7

absent approximately four hours on May 8, 1996, and such absence was classified as paid doctor. *Id.*

State Farm received a May 13, 1996 letter from Dr. Fox, a chiropractor, indicating that he was treating Plaintiff from May 13 until May 20, 1996 for injuries relating to the auto accident and was taking her off work as he had "found that the ergonomics of her work station to be reducing the efficacy of her therapy." *Depo. of Jean Estes* at 147, Ex. 17; *Depo. of T. Graham*, Ex 6. Plaintiff was absent approximately 45 minutes on May 13, 1996, and such absence was classified as paid doctor. *Depo. of T. Graham*, Ex 6. Plaintiff was absent May 14-17, 1996, and such absences were classified as paid sick leave. *Id.*

Plaintiff was absent a half day on June 5, 1996, and such absence was classified as paid vacation. *Id.*, Ex. 8. Plaintiff was absent on June 12, 1996, and such absence was classified as paid sick family. *Id.* Plaintiff was absent a half day on June 24, 1996, and such absence was classified as paid vacation. *Id.* Plaintiff was absent one hour and forty-five minutes on June 28, 1996, and such absence was classified as personal time. *Id.* Plaintiff was absent on July 9, 1996, and such absence was classified as paid sick leave. *Id.* Plaintiff was absent thirty minutes on July 10 and two hours and forty-five minutes on July 11, 1996; the absence on July 11 was classified as paid doctor. *Id.* Plaintiff was absent two hours on July 16, 1996, and such absence was classified as personal time. *Id.*

Dr. Crompton, one of Plaintiff's physicians, provided a form to State Farm indicating that Plaintiff was unable to work on July 17, 18 and 19 because of chronic neck pain relating to the auto accident and that she was awaiting her appointment with him. *Depo. of Jean Estes* at 145-46, Ex. 15. Plaintiff was absent July 17-19, 1996, and such absences were

8

classified as paid sick leave. *Depo. of T. Graham*, Ex 8. X-rays of plaintiff's neck were done on July 19, 1996, and were normal. *Depo. of Marc Husid* at 16.

Plaintiff was absent three hours and fifteen minutes on July 23, 1996, and such absence was classified as paid doctor. *Depo. of T. Graham*, Ex. 8.

Plaintiff was examined by Dr. Marc Husid on July 23, 1996. *Depo. of Marc Husid* at 11. She reported that she had experienced pain in the neck ever since the auto accident which increased in severity and radiated into both sides of the head and the low back region once or twice a week, and that such pain was accompanied by nausea, blurred vision, pain in the eyes, and occasional tingling in the arms. *Id.* at 14. She also told Dr. Husid that the treatments by plaintiff's chiropractor "feel wonderful" but had no lasting effect. *Id.* Dr. Husid found that "[s]he was moderately tender to palpation, or general pressure, over the neck and upper back muscles," and that her range of motion was "a little bit limited in all directions." *Id.* at 22, 24. Dr. Husid prescribed two medications for headaches, referred her to physical therapy for soft tissue therapy on her neck and upper back, and asked her to return in three to four weeks. *Id.* at 35. State Farm received a copy of the July 23 referral to physical therapy from Plaintiff and put it in her medical file. *Depo. of Jean Estes* at 136, Ex. 14. When plaintiff requested work release two days later, Dr. Husid testified that he told his assistant, "I don't see any reason why [the plaintiff] can't work. I know it's inconvenient, but have her try to." *Depo. of Marc Husid* at 38.

On July 24, 1996, plaintiff was present at work. *Depo. of T. Graham*, Ex. 8. On that day, Angela Graham met with plaintiff to discuss plaintiff's absences and informed her that the following memo was being placed in her personnel file:

9

Memo
To:    Tia Graham
From:  Angela Graham, Communications Supervisor
Date:  July 24, 1996
Re:    Excessive Absences

I am submitting this memo to your Personnel Shield to stress our concern
about your excessive non-FMLA protected absence record. You have been
absent from work 172 hours since June 1, 1995. These non-FMLA protected
hours include:

>       104:30 hours PSL
>       37:25 hours PSF
>       15:30 hours LA
>       15:15 hours PD

You are aware of our concern regarding your non-FMLA protected absences
as I have counseled with you several times regarding this subject.
Communications is staffed at the appropriated level. Absences from your
primary job of the switchboard and secondary job of invoice processing
places unnecessary burdens on the unit's work flow and on fellow
employees. You are aware of the importance of taking responsibility for your
job and the priority that should be placed on attendance.

Further non-FMLA protected absences could directly affect all future
permission policy absences and result in disciplinary action. As your
supervisor, I am available at all times to help you resolve this concern. We
will sit down together and follow up on the contents of this memo in thirty
days, August 24, 1996.

Signature:
Angela Graham
Supervisor

Tia Graham

Jan Youngman
Asst. Manager

cc:    Human Resources

*Id.* at 141-43, Ex. 7; *Depo. of A. Graham* at 63.

10

After the meeting with Angela Graham, plaintiff went to see Jean Estes and showed her a copy of the memo. *Depo. of T. Graham* at 145. Estes told plaintiff it was too late to get FMLA protection for her absences and that she should try to get her future appointments in the late afternoon. *Id.* at 146. According to the plaintiff, Estes also told her not to get Angela Graham angry with her because, "once a supervisor gets on your back or gets upset at State Farm, they will stay on your back." *Id.* at 145.

After July 24, 1996, plaintiff never again reported to work at State Farm. *Id.* at 159, Ex. 8. On July 25, 1996, plaintiff called Dr. Husid's office and asked for a work release for one to two weeks. *Depo. of Marc Husid* at 36, 37, Ex. 2. At that time, Dr. Husid denied plaintiff's request to take her off work because he did not "see any reason why she can't work." *Id.* at 38.

On August 2, 1996, plaintiff sent a letter to Marvin Reeves, with a copy to Angela Graham and Jean Estes, informing State Farm of her need for continuing medical treatment and requesting a leave of absence through August 20, 1996. *Depo. of T. Graham* at 9, Ex. 9. Plaintiff admits that no one at State Farm ever told plaintiff she could not have time off. *Id.* at 173. Estes sent a blank Medical Certification Form to plaintiff for her to have her doctor complete on August 5, 1996. *Depo. of Estes* at 121-122, Ex. 5. She also sent a form for plaintiff to sign which authorized plaintiff's doctors to release medical information to State Farm, which plaintiff signed on August 8. *Id.* at 125-126, Ex. 6.

On August 8, 1996, although she apparently did not have a scheduled appointment, plaintiff again saw Dr. Husid. *Depo. of Marc Husid* at 38-39. According to Dr. Husid, plaintiff "came in in tears looking quite distraught telling me that she attempted to return to work

11

the day after I initially saw her but got sick and had to leave and has not been able to return." *Depo. of Marc Husid* at 38-39. Plaintiff reported to Dr. Husid that "She [was] concerned that she may lose her job. She [was] tired, she [was] stressed over her three children, marital difficulties, and making her various doctor appointments. She complained of burning pain up and down her back." *Depo. of Marc Husid* at 40.

Dr. Husid completed and signed a three page Medical Certification Form for State Farm on plaintiff on August 8, 1996. *Id.* at 51-52, Pl. Ex. 2. The Medical Certification Form indicates a "Disability Start Date" taking plaintiff off work from July 23, 1996 and indicating he would re-evaluate her on August 15, 1996. *Id.* at 52-53, Pl. Ex. 2. Dr. Husid agrees with everything on the Medical Certification Form, as completed. *Id.* at 52, Pl. Ex. 2. The Medical Certification Form indicated Dr. Husid's opinion that plaintiff had a serious health condition under the FMLA and that laintiff was unable to work from July 23, 1996 through August 15, 1996, at which time she would be "re-evaluated." *Id.* at 52, Pl. Ex. 2, *Depo. of Jean Estes*, Ex.7. The Medical Certification Form indicated that plaintiff's serious health condition under the FMLA was "absence plus treatment." *Depo. of Jean Estes* at 142-44, Ex. 7. The Medical Certification Form also indicated Dr. Husid's opinion that plaintiff's treatments needed to be scheduled during normal work hours. *Depo. of Marc Husid* at 52, Pl. Ex. 2; *Depo. of Jean Estes*, Ex. 7. State Farm received the Medical Certification Form in response to Estes' request to plaintiff of August 5 on or before August 20, 1996. *Depo. of Jean Estes* at 126-127, Ex 7.

Dr. Husid again saw plaintiff on Monday, August 19, 1996, at which time he completed a medical release to State Farm indicating that plaintiff should return to work

12

the following Monday, August 26, 1996. *Depo. of Marc Husid* at 47-48; *Depo. of Jean Estes*, Ex. 13.

State Farm determined plaintiff to be AWOL (absent without leave) for the days of August 16 and 19, 1996, on August 20, 1996. *Depo. of Jean Estes*, Ex 9 & 19.

At some point after August 20, Estes spoke with Dr. Husid and was told that plaintiff was "in a lot of pain" and that Dr. Husid was keeping plaintiff off work until August 26, 1996. *Id.* at 135-136, Ex. 8. Estes was aware that the medical documents and excuses in plaintiff's file indicated a pattern of medical problems arising from the auto accident, and that plaintiff was having ongoing problems, pain, chronic neck and back pain and suffering from her injuries in the automobile accident. *Id.* at 147-49, Ex. 7, 14, 15, 16 & 17. Such documents would indicate to Estes that plaintiff had a continuing need for treatment for her injuries from the auto accident. *Id.* Such documents would indicate to Estes that plaintiff had a serious health condition under the FMLA in August 1996. *Id.*

When plaintiff failed to show up at work on the morning of August 26, 1996, Angela Graham prepared a memorandum to Jan Youngman which recounted the plaintiff's absence from work since July 24, 1996, including the time she was deemed AWOL on August 16 and 19, 1996. Angela Graham recommended that due to the "repeated incident of AWOL," the plaintiff should be terminated immediately. *Id.* at 170-71, Ex. 19; *Depo. of A. Graham* at 98, 119-21. The August 26 memo does not state that plaintiff's absences after July 24, 1996 were non-FMLA protected. *Depo. of Jean Estes*, Ex 19. Angela Graham's supervisors signed the August 26 memo and fully agreed with it. *Depo. of A. Graham* at 124-125.

13

Plaintiff submitted a letter of resignation to State Farm effective August 26, 1996.

*Depo. of T. Graham* at 92-98, 106, Ex. 2. In her letter of resignation, plaintiff stated that:

> I feel at this point after going through all the therapy that I have been through the ergonomics of my job, in the past have aggravated my conditions, causing me to have severe headaches, also the anxiety and stress of everything concerning my condition. I have tried to sit down at a desk since school started to help my children with their homework and I am having difficulty doing that. I want to thank all my co-workers and State Farm. I apologize to all my fellow members as well as my friends for the burdens I have placed upon them.

*Depo. of T. Graham*, Ex. 2.

## II.    Summary Judgment Standard.

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). The movants can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23. There is no requirement, however, "that the moving party

14

support its motion with affidavits or other similar materials *negating* the opponent's claim." *Id.* at 323.

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions of file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (quoting Fed. R. Civ. P. 56(e)). The nonmoving party need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings. *Celotex*, 477 U.S. at 324. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322.

After the plaintiff has properly responded to a proper motion for summary judgment, the court must grant the motion if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The substantive law will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. His guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party

15

must prevail as a matter of law." *Id*. at 251-52; *see also Bill Johnson's Restaurants, Inc. v. N.L.R.B.*, 461 U.S. 731, 745 n.11(1983). However, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Anderson*, 477 U.S. at 249 (citations omitted); *accord Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989). Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff. *Anderson*, 477 U.S. at 254; *Cottle v. Storer Communication, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988). Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore the evidence of the non-movants is to be believed and all justifiable inferences are to be drawn in his favor. *Anderson*, 477 U.S. at 255. The non-movant need not be given the benefit of every inference but only of every reasonable inference. *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## III.    Discussion.

Because this court's jurisdiction over plaintiff's state law claims depends on the viability of her claims under the FMLA, the court will address the claims over which it has original jurisdiction before proceeding to consider, if necessary, the state law claims. If no federal claim survives summary judgment, the court sees no reason why the other claims should not be dismissed or remanded pursuant to 28 U.S.C. § 1367(c)(3).

In deciding whether a plaintiff has stated a claim of FMLA discrimination based on circumstantial evidence, courts have borrowed the analytical framework utilized in cases brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq. See Morgan v. Hilti, Inc.,* 108 F.3d 1319, 1325 (10th Cir. 1997); *Dollar v. Shoney's, Inc.,* 981 F. Supp. 1417, 1419 (N.D. Ala. 1997); *Kaylor v. Fannin Regional Hospital, Inc.,* 946 F. Supp. 988, 999 (N.D. Ga. 1996); *Peters v. Community Action Committee, Inc.,* 977 F. Supp. 1428 (M.D. Ala. 1997). Applying the test from *McDonnell Douglas v. Green,* 411 U.S. 792 (1973), to the FMLA context, the plaintiff may establish a *prima facie* case by showing that: (1) she availed herself of a protected right under the FMLA; (2) she was adversely affected by an employment decision; (3) there is a causal connection between the protected activity and the adverse employment action; and (4) she was qualified for her position at the time of the adverse employment action. *See Kaylor,* 946 F. Supp. at 1001 (citing *Stanfield v. Answering Service, Inc.,* 867 F.2d 1290, 1293 (11th Cir. 1989)).

Plaintiff's second amended complaint, filed March 30, 1998, contains a lengthy list of FMLA violations that State Farm is alleged to have committed. Among other things, plaintiff contends that State Farm violated her rights under the FMLA and its implementing regulations by: (1) failing to inform her of her rights under the FMLA; (2) interfering with her rights under the FMLA; (3) misrepresenting the FMLA to her; (4) interfering or attempting to interfere with her medical treatment; (5) failing to determine that she was entitled to FMLA leave; (6) plotting to terminate her employment at State Farm by making conditions intolerable to the extent that plaintiff would resign; (7) constructively terminating plaintiff's employment; (8) intimidating, harassing, and discriminating against her; and (9)

17

retaliating against her for taking leave. State Farm denies having violated the FMLA in any respect.

Although many of plaintiff's allegations are complex, this court need not address the alleged technical violations of the FMLA in detail because plaintiff has simply failed to demonstrate that she suffered any "adverse employment action" for purposes of stating a *prima facie* case under the FMLA. In support of her claim that she was subject to an adverse employment action, plaintiff offers three possibilities: (1) the July 24, 1996 memorandum regarding her absences that was placed into her employee file; (2) the classification of her absences of August 16 and 19, 1996, as time when she was AWOL; and (3) her constructive discharge.

The Eleventh Circuit recently joined the First, Ninth, and Tenth Circuits in holding that Title VII's protection against retaliatory discharge extends to adverse actions which fall short of ultimate employment decisions. *See Wideman v. Wal-Mart Stores, Inc.,* 141 F.3d 1453 (11th Cir. 1998). Thus, actions such as undeserved negative job evaluations, demotions, disadvantageous transfers, or toleration of harassment are actionable under the retaliation clause. *See id.* at 1456 (citing *Yartzoff v. Thomas,* 809 F.2d 1371, 1375 (9th Cir. 1987); *Berry v. Stevinson Chevrolet,* 74 F.3d 980, 984–86 (10th Cir. 1996)). Of course, "some threshold level of substantiality . . . must be met for unlawful discrimination to be cognizable under the anti-retaliation clause." *Id.* The July 24, 1996 memorandum and the AWOL classification of the two days in August simply do not meet the "threshold level of substantiality" required by the Eleventh Circuit in *Wideman.* Neither action constitutes an unwarranted negative job evaluation or disadvantageous transfer of responsibilities. The

18

July memorandum merely expressed concern with plaintiff's absences and warned of possible ramifications; and State Farm had ample reason to classify plaintiff's August absences as being "without leave" since plaintiff had presented an excuse note that only extended through August 15, 1996 and State Farm didn't hear from plaintiff until August 20, 1998. In addition, plaintiff did not suffer any repercussions from either of these actions. In such circumstances, courts have generally found no adverse employment action. *See Green v. Runyon,* 131 F.3d 151 (10th Cir. 1997); *Sweeney v. West,* 149 F.3d 550, 556 (7th Cir. June 29, 1998); *Nelson v. University of Maine System,* 923 F. Supp. 275 (D. Maine 1996); *Rivers v. Baltimore Dep't of Recreation Parks,* 1990 WL 112429, *10 (D. Md. Jan. 9, 1990).

Plaintiff's claim that she was constructively discharged is similarly untenable. The Eleventh Circuit has instructed that in order to prove constructive discharge, an employee "must demonstrate that [her] working conditions were so intolerable that a reasonable person in [her] position would be compelled to resign." *Morgan v. Ford,* 6 F.3d 750, 755 (11th Cir. 1993). Plaintiff is patently unable to meet this standard. While she alleges that the July 24, 1996, memorandum led her to believe that she was going to be terminated if she missed any more days of work, a reading of that memorandum illustrates clearly that the belief was not reasonable[2]—plaintiff's subjective feelings about State Farm's actions, whatever they may have been, are not determinative. *Doe v. DeKalb Co. School Dist.,* 145 F.3d 1441, 1450 (11th Cir. 1998). It is undisputed that plaintiff did not know of Angela Graham's recommendation that she be terminated when she resigned. Furthermore,

---

[2]The memo states in relevant part: "Further non-FMLA protected absences could directly affect all future permission policy absences and result in disciplinary action. As your supervisor, I am available at all times to help you resolve this concern." *Depo. of T. Graham* at 141-43, Ex. 7

19

plaintiff's letter of resignation, in which she expressly thanks State Farm, does not by its terms lend support to a theory that plaintiff was forced to resign due to "intolerable" working conditions. *See Depo. of T. Graham*, Ex. 2.

Besides failing to show that she was subject to an adverse employment action, plaintiff has not demonstrated that she suffered any damages as a result of State Farm's actions. Even if the defendants have committed certain technical infractions under the FMLA, plaintiff may not recover in the absence of damages. *See Cianci v. Pettibone Corp.,* 1998 WL 498544 (7th Cir. Aug. 19, 1998); *Beal v. Rubbermaid Commercial Prod., Inc.,* 972 F. Supp. 1216 (S.D. Iowa 1997), *aff'd,* 149 F.3d 1186 (8th Cir. 1998); *Szabo v. Trustees of Boston University,* 1998 WL 151272 (D. Mass. Mar. 18, 1998); *Dodgens v. Kent Mfg. Co.,* 955 F. Supp. 560, 564-65 (D.S.C. 1997); *Fisher v. State Farm Mutual Automobile Insurance Co.,* 999 F. Supp. 866, 871 (E.D. Tex. 1998). Plaintiff was never denied leave time by State Farm. In fact, she was provided with more than 170 hours of leave in the 12 months between her automobile accident and her resignation, most of which was paid. As this court has noted, the FMLA does not allow recovery for mental distress or the loss of job security. *McAnnally v. Wyn South Molded Prods.,* 912 F. Supp. 512 (N.D. Ala. 1996). And, as discussed earlier, plaintiff cannot make a claim of actual or constructive discharge.

## IV.    Conclusion

For the foregoing reasons, defendant's motion for summary judgment will be granted and the remaining state law claims will be dismissed without prejudice.

A separate order, consistent with this opinion, will be entered.

Done, this _**25**_ of September, 1998.


_____

EDWIN L. NELSON
UNITED STATES DISTRICT JUDGE

21